STEVEN G. KALAR
Federal Public Defender
Northern District of California
CANDIS MITCHELL
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Candis_Mitchell@fd.org

Counsel for Defendant Galeas-Raudales

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America**, | Case No.: CR 19–660 EMC |
| Plaintiff, | **Sentencing Memorandum** |
| v. | Hearing Date: March 25, 2020 |
| **Damien Galeas-Raudales,** | Hearing Time: 2:30 p.m. |
| Defendant. | |

INTRODUCTION

Defendant Damien Galeas-Raudales, through undersigned counsel, respectfully offers the following memorandum in support of his request for a time served sentence of imprisonment.

The time serviced sentence is appropriate for the following reasons: (1) the § 3553(a) factors militate in favor of a substantially reduced sentence; (2) Mr. Galeas-Raudales will have additional custodial time following his criminal case as he awaits deportation to Honduras; and, (3) to reduce the increased risk of catastrophic infection of Coronavirus Disease 2019 (COVID-19) given the combination of poor heath care and confined conditions at Santa Rita Jail.

//

SECTION 3553(A) ANALYSIS

**1. The Nature and Circumstances of the Offense**

On November 21, 2019, Mr. Galeas-Raudales was approached by an undercover police officer looking to buy drugs. The officer asked for $20 worth of crack. Mr. Galeas-Raudales was arrested without incident shortly afterwards. When he was searched he was found with bindles of crack, methamphetamine, and heroin packaged for individual sale.

**2. The History and Characteristics of the Defendant**

Born and raised in Honduras for most of his life, when Mr. Galeas-Raudales was younger he did not always have enough food to eat. When he was growing up he was threated by the gangs in Honduras who threatened him every day with guns to encourage him to join with them. Always declining, Mr. Galeas-Raudales feared for his life.

It is little wonder that in 2018, Mr. Galeas-Raudales found himself atop a train slowly travelling from Honduras through Central America to Mexico and then eventually on foot to cross the border into the United States.



Image 1. Migrants arrive at a rest stop in Ixtepec, Mexico, after a 15-hour ride atop a freight train headed north toward the U.S. border on Aug. 4. Thousands of migrants ride atop the trains, known as *La Bestia,* or The Beast, during their long and perilous journey through Mexico to the U.S.[1]

---

[1] *John Moore/Getty Images.* Taken from Sayre, Wilson, "Riding 'The Beast' Across Mexico To The U.S. Border" Parallels (June 4, 2014). Accessed at:

Whether caused by gangs, an ineffective government, drug trafficking, or poverty, Honduras currently claims the title of "murder capital of the world."[2] The government suffers from corruption and has lost international funding after allegations of human rights abuse.[3] There are also allegations of gang infiltration of their police force.[4] "According to the State Department, 42 percent of all cocaine headed to the U.S. and 90 percent of all cocaine flights now travel through Honduras."[5] In short, the country is hard on its citizens and harder still on people like Mr. Galeas-Raudales who lack the education or money to change his place in the world.

He took the chance and travelled, eventually ending up Northern California. After he arrived, he initially worked intermittently doing remodeling and moving. While working, some friends that he knew told him that he could make some easy money selling drugs. He agreed to do so because it greatly increased the funds he had to support his family in Honduras.

**3. The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; To Afford Adequate Deterrence**

The requested sentence is appropriate in light of the totality of the circumstances and, thus, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and serves as an adequate deterrence to criminal conduct.

**4. The Need for the Sentence Imposed To Protect the Public from Further Crimes of the Defendant; and**

Mr. Galeas-Raudales will be deported following the conclusion of his sentence and it is unlikely that the he will repeat his actions in the future. He has no significant criminal history and the public faces little risk of harm from further crimes.

---

https://www.npr.org/sections/parallels/2014/06/05/318905712/riding-the-beast-across-mexico-to-the-us-border.

[2] United States Department of State Bureau of Diplomatic Security. Honduras 2018 Crimes and Safety Report, (April 3, 2018). Accessed at: https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=23798

[3] Khan, Carrie, "Honduras Claims Unwanted Title of World's Murder Capital" Parallels (June 12, 2013). Accessed at: https://www.npr.org/sections/parallels/2013/06/13/190683502/honduras-claimsunwanted-title-of-worlds-murder-capital.

[4] *Id.*

[5] *Id.*

SENTENCING MEMORANDUM
*GALEAS-RAUDALES*, CR 19–660 EMC

3

5. **The Need for the Sentence Imposed To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

Mr. Galeas-Raudales has a 10th grade education and speaks primarily Spanish—it is unlikely that any sentence that was not a lengthy one would legitimately provide him sufficient time in custody for him to acquire language skills that would permit him to attain a high school education or complete vocational training while in custody.

Additionally, as of March 18, 2020, the new strain of coronavirus that causes COVID-19, has infected over 215,956 people, leading to at least 8,757 deaths worldwide.[6] On March 11, the World Health Organization officially classified COVIC-19 as a pandemic.[7] Governor Newsom declared a State of Emergency and all six Bay Area counties are currently under a shelter in place order. As of March 18, 2020, there are a total of 865 positive cases and 16 deaths in California.[8] As of March 14, 2020, there are 40 of positive cases of COVID-19 in the city of San Francisco alone. These numbers are rising exponentially. With confirmed cases in San Francisco and the entire Bay Area that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[9] An opinion piece in the New York Times describes these unique and pressing issues.[10] Inmates cycle in and out of detention facilities from all over the county, and people who work in the facilities including correctional officers, and care and service providers leave and return daily, without screening. Incarcerated people generally have poorer health than the general population, and even at the best of times, medical care in custody is (at best) limited.[11] Many people

---

[6] As of 6:53 pm on March 18, 2020, according to the Coronavirus Resource Center as tracked by the Johns Hopkins University of Medicine. Accessed at http://coronavirus.jhu.edu.
[7] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.
[8] *See* Coronavirus Resource Center at http://coronavirus.jhu.edu.
[9] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.
[10] *Our Courts and Jails Are Putting Lives at Risk*, Emily Bazelon, New York Times, March 13, 2020, available at https://www.nytimes.com/2020/03/13/opinion/coronavirus-courts-jails.html?searchResultPosition=1.
[11] Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice

who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[12]

Outbreaks of the flu regularly occur in jails and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[13] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[14] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[15] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[16] In the U.S. steps are already being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the refusing the admission of individuals arrested on non-violent misdemeanor charges.[17]

At Santa Rita jail there have been weeks of flu outbreaks, with different units being quarantined

---

Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf
[12] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.
[13] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.
[14] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.
[15] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.
[16] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.
[17] In New York Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners (Sarah Lustbader, *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) *at* https://theappeal.org/sentenced-to-covid-19/.); Cuyahoga County (Ohio) is holding mass pleas and bail hearings to reduce the current jail population (https://www.cleveland.com/court-justice/2020/03/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html); Mahoning County (Ohio) jail is refusing all non-violent misdemeanor arrestees (https://www.wkbn.com/news/coronavirus/mahoning-county-jail-refusing-some-inmates-due-to-coronavirus-outbreak/); see also Collin County (TX) (https://www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/);

on a regular basis and yet infections continuing to spread. Inmates are in tight quarters, even more so with the closure of North County jail. Access to personal hygiene items is limited with only those inmates that have certain means able to purchase commissary (better/more soap and other hygiene items). Additionally, the jail has now restricted all visits to the jail and only allows attorney visits. No family, friends or even experts are allowed into the jail.

Santa Rita jail lacks even some basic medical care and certainly lacks the resources necessary to engage in screening and testing of inmates, correctional staff, law enforcement officers and other care and service providers who enter the facility.

As additional people are arrested who have been out in the community as the coronavirus spreads, if they are not symptomatic, they will be brought into Santa Rita jail and held with the existing population, potentially bringing COVID-19 into this population held in large numbers, close quarters, and low sanitary conditions. If COVID-19 gets into the jail, it is going to spread like wildfire. The medical care in the jail is subpar in the best of times; we can only imagine how catastrophic it will be if there is a greater stress on the system.

Put simply, in light of this pandemic there is no need for Mr. Galeas-Raudales to remain in custody where he faces greater risks to his physical health.

6. **The Kind of Sentences Available**

Here, the Court may impose any sentence up to 20 years' imprisonment, life-time supervised release, a $1,000,000 fine, and a $100 special assessment. A minimum term of three-years' supervised release is required.

7. **The Sentencing Range Established for the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines**

   A. **Mr. Galeas-Raudales's Proposed Guideline Calculations**

   Base Offense Level, USSG § 2D1.1(c)(14)............................................ 18
   Acceptance of Responsibility, USSG § 3E1.1(a) & (b) ........................ –3

   Total Offense Level ................................................................................ 15
   Criminal History Category ..................................................................... II
   Sentencing Guideline Range ............................................................. 21-27
   Mr. Galeas-Raudales's Recommendation ......time served (3.5 months)

### B. The Court Should Adjust Downward Three Levels for Acceptance of Responsibility

Pursuant to U.S.S.G. § 3E1.1, the Court should depart three-levels because Mr. Galeas-Raudales accepted responsibility for his involvement in the present offense as demonstrated by his guilty plea and his truthful admission of the conduct comprising the offense.

### 8. Any Pertinent Policy Statement

While Mr. Galeas-Raudales would generally encourage the Court to not impose supervised release for individuals like Mr. Galeas-Raudales who will deported after the conclusion of their sentence, he recognizes that supervision is required to be imposed as a consequence of his conviction.

### 9. Unwarranted Sentencing Disparity

While the requested sentence is a departure from the guideline range, the departure is *di minimis* when considering the conduct and the additional time Mr. Galeas-Raudales will spend in immigration custody prior to his deportation. Additionally, the sentence is in accord with similarly situated defendants engaged in similar conduct swept up in the Tenderloin Drug initiative.

Here, Mr. Galeas-Raudales had a limited function and extremely limited involvement—he was was a street level dealer. He had no ability to dictate the price or terms of the sale. He went and picked up his wares and sold it and made very little money a day—approximately $100. He was not responsible for packaging, delivering, or controlling what he sold. He should be sentenced accordingly.

### 10. Restitution

There is no need for an order of restitution in this case.

### CONCLUSION

The facts before the Court establish compelling reasons to impose a sentence below the guideline range—Mr. Galeas-Raudales asks the Court to sentence him to a term of imprisonment of time served (approximately 3.5 months).

Dated: March 18, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

_____/S_____
CANDIS MITCHELL
Assistant Federal Public Defender